UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF NEW YORK, | ) | Civil Action No. 13-CV-4165 |
| | ) | (NGG) |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| RAYMOND O'TOOLE, ILONA SPIEGEL, and | ) | |
| STEVEN FARRELL, individually and on behalf | ) | |
| of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| ANDREW M. CUOMO, in his official | ) | Civil Action No. 13-CV-4166 |
| capacity as Governor of the State of New | ) | (NGG) |
| York, NIRAV R. SHAH, in his official | ) | |
| capacity as Commissioner of the New York | ) | |
| State Department of Health, KRISTIN M. | ) | |
| WOODLOCK, in her official capacity as | ) | |
| Acting Commissioner of the New York | ) | |
| State Office of Mental Health, THE NEW | ) | |
| YORK STATE DEPARTMENT OF | ) | |
| HEALTH, and THE NEW YORK STATE | ) | |
| OFFICE OF MENTAL HEALTH, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SUPPLEMENT TO SECOND AMENDED
## STIPULATION AND ORDER OF SETTLEMENT

**WHEREAS**, the parties entered into a Stipulation and Order of Settlement on July 23, 2013, an Amended Stipulation and Order of Settlement on January 30, 2014, and a Second Amended Stipulation and Order of Settlement on May 4, 2017; and

**WHEREAS**, the Second Amended Stipulation and Order of Settlement is incorporated herein by reference in its entirety, except for the modifications to the terms and conditions of the Second Amended Stipulation and Order of Settlement to which the parties have agreed, which are specifically set forth below;

**IT IS HEREBY STIPULATED AND AGREED** by and among the undersigned that the following terms and conditions supplement or, where specifically noted, modify the terms and conditions set forth in the Second Amended Stipulation and Order of Settlement:

## A. DEFINITIONS

1. "Agreement" means the Second Amended Stipulation and Order of Settlement.

2. "Community Housing Other than Supported Housing" means housing other than Supported Housing that is offered to NYC Adult Home Residents to transition out of NYC Impacted Adult Homes pursuant to the Agreement and this Supplement to the Agreement, including Family Care, Fountain House, Level II Housing (which includes Apartment Treatment, Congregate Treatment, Community Residence/Single Room Occupancy (CR/SRO)), OASAS Housing, OMH Community Housing, OPWDD Housing, Residence with Supportive Services for Mother and Child, Senior Housing, State-Operated Community Residence (SOCR), and Supported/Single Room Occupancy (SP/SRO).

3. "Effective Date" means the date that this Supplement to the Second Amended Stipulation and Order of Settlement is executed by all parties.

4. "Settlement Implementation Providers" means all providers involved in carrying out the State's obligations under the Second Amended Stipulation and Order of Settlement and this Supplement to the Second Amended Stipulation and Order of Settlement, including, but not limited to, Housing Contractors and their staff, Care Managers and other staff from Health Homes and Managed Long Term Care Plans, the Peer Bridger Program and their staff, and assessment entities and their staff.

5. "Supplement" means this Supplement to the Second Amended Stipulation and Order of Settlement.

## B. PROCESS METRICS

1. Housing Contractors will assume responsibility for conducting assessments pursuant to section F of the Agreement.  The State shall train all assessors (or provide supplemental training, for assessors who have already received training) regarding the requirements set forth in the Agreement and this Supplement. Housing Contractors assigned to NYC Impacted Adult Homes in the Bronx and Richmond Counties ("Phase 1 Housing Contractors") shall begin to conduct assessments no later than April 1, 2018 or one month after the Effective Date, whichever is earlier.  Housing Contractors assigned to NYC Impacted Adult Homes in Kings and Queens Counties ("Phase 2 Housing Contractors") shall

2

begin to conduct assessments no later than six months after the Effective Date. The State shall ensure that all Housing Contractors use the New York City Human Resources Administration (HRA) 2010e form rather than the Community Mental Health Assessment form to complete assessments. The new assessment process shall be fully operational no later than nine months after the Effective Date.

2. **Cycle Time Requirements.**

   a. **In-Reach.** Newly admitted NYC Adult Home Residents shall receive in-reach no later than one month after being added to the Community Transitions List.

   b. **Referral for Assessment.** All NYC Adult Home Residents who have received in-reach and agreed, or not refused, to be assessed will be referred for assessment within five business days after they receive in-reach.

   c. **Clearing the Assessment Backlog.** All NYC Adult Home Residents who have, as of the Effective Date, agreed or not refused to be assessed will be assessed within four months of the Effective Date.

   d. **New Assessments.** All NYC Adult Home Residents who are referred for assessment following the Effective Date of this Supplement shall be assessed (or, in permissible cases set forth in section B(4) below, the assessment closed out) pursuant to the following timeframes and percentages:

      i. At least 85% of NYC Adult Home Residents who are referred for assessment shall be assessed (or have the assessment closed out) within 60 days of the NYC Adult Home Resident being referred for assessment;

      ii. At least 98% of NYC Adult Home Residents who are referred for assessment shall be assessed (or the assessment closed out) within 120 days of the NYC Adult Home Resident being referred for assessment; and

      iii. Any NYC Adult Home Resident who is referred for assessment and not assessed within 120 days shall be referred to the Case Review Committee.

   e. **Care Management and Person-Centered Care Plans.**

      i. At least 85% of NYC Adult Home Residents shall be enrolled in care management at the ratio of no more than twelve NYC Adult Home Residents to one Care Manager, and the creation of a person-centered care plan pursuant to section G of the Agreement

3

shall begin, within 60 days of the NYC Adult Home Resident being referred for assessment.

ii. At least 98% of NYC Adult Home Residents shall be enrolled in care management at a 12:1 ratio, and the creation of a person-centered care plan shall begin, within 90 days of the NYC Adult Home Resident being referred for assessment.

iii. Any NYC Adult Home Resident who has not been enrolled in care management at a 12:1 ratio or for whom the creation of a person-centered care plan has not begun within 90 days of the NYC Adult Home Resident being referred for assessment shall be referred to the Case Review Committee.

iv. If an NYC Adult Home Resident is deemed to have refused to engage in the assessment process under the circumstances set forth in section B(5) below, the NYC Adult Home Resident will be disenrolled from 12:1 care management.

3. For purposes of compliance with section B(2)(c)-(d) of this Supplement, an assessment shall be considered to have been conducted only when an NYC Adult Home Resident has been assessed and a completed assessment package is sent to HRA for review.

4. An assessment may be closed out – but the assessment will not be considered to have been conducted – if an NYC Adult Home Resident (i) chooses not to transition, (ii) is determined not to be appropriate to transition, or (iii) has refused to engage in the assessment process as set forth in section B(5) below. The assessor must complete an Adult Home Resident Assessment Report when an assessment is closed out.

5. An NYC Adult Home Resident may be determined to have refused to engage in the assessment process if he or she has canceled or failed to appear for three or more assessment appointments; has ignored three or more attempts to reschedule a canceled appointment; has refused to cooperate with an assessor during the assessment on at least three occasions; or has stated to the assessor that he or she no longer wants to move out of the Adult Home. The State shall provide Plaintiffs' counsel and the Independent Reviewer with documentation of any NYC Adult Home Resident's refusal to engage in the assessment process. The State shall then give the Peer Bridger assigned to the adult home in which the NYC Adult Home Resident resides (or the Housing Contractor assigned to the adult home in which the NYC Adult Home Resident resides, if a Peer Bridger is not yet assigned) two weeks to engage the NYC Adult Home Resident. Plaintiffs' counsel may also engage the NYC Adult Home Resident during this two-week period if they wish. This two-week engagement period shall not be counted against the State for the purposes of calculating compliance with the performance metric.

6.  If an NYC Adult Home Resident is determined to have refused to engage in the assessment process under the circumstances set forth in section B(5) of this Supplement, that NYC Adult Home Resident will continue to receive in-reach and be engaged through the Peer Bridger Program described in section F(2) below.  If an NYC Adult Home Resident subsequently decides that he or she is willing to move or engage in the assessment process, he or she will again be referred for assessment.

7.  Transition planning by Settlement Implementation Providers shall begin as soon as an NYC Adult Home Resident is assessed and found appropriate for Supported Housing or for Community Housing Other than Supported Housing.

8.  The State will not be held to the cycle time requirements set forth in section B(2)(e) of this Supplement for NYC Adult Home Residents currently enrolled in the Assisted Living Program until four months after the Effective Date.  The cycle time requirements set forth in section B(2)(e) of this Supplement will not apply to NYC Adult Home Residents who, despite the State's diligent efforts, choose not to engage in care management, to NYC Adult Home Residents who are deemed as having refused to engage in the assessment process under the circumstances set forth in section B(5) of this Supplement, or to NYC Adult Home Residents who fail to cooperate in the development of a person-centered care plan.

9.  NYC Adult Home Residents who are not Medicaid eligible or who are not enrolled in a Health Home or Managed Long-Term Care Plan will be offered the same care management services that Medicaid-eligible NYC Adult Home Residents receive.

10. HRA applications, including completed assessments, shall be sent to HRA for approval within five business days of completion of the assessment.  Once HRA has approved an application for a resident to transition out of an adult home, the State shall ensure that the Housing Contractor offers the resident an initial post-HRA approval meeting no more than two weeks after the Housing Contractor receives the approval letter from HRA.  The State shall also ensure that no more than 45 days after the Housing Contractor receives the approval letter from HRA, the Housing Contractor will offer the resident the opportunity to be shown at least one apartment that is available and that meets the resident's needs, hopes and desires as set forth in his or her person-centered care plan and transition plan.

11. The State shall ensure that Housing Contractors make all reasonable efforts to transition NYC Adult Home Residents, within 60 days of HRA approval, into Supported Housing (or Community Housing Other than Supported Housing, where appropriate) that is consistent with the individual's needs, hopes and desires as set forth in his or her person-centered care plan and transition plan.  In the event that an NYC Adult Home Resident does not transition within 60 days of HRA approval, the Housing Contractor shall continue to make all reasonable efforts to transition the individual.

12. No less than three weeks before an NYC Adult Home Resident is scheduled to transition from an adult home, the NYC Adult Home Resident's Adult Home Plus Care Manager and designated Housing Contractor shall meet in person or telephonically with the NYC Adult Home Resident to address his or her needs upon transition, including, but not limited to, ensuring that all benefits and services called for in the discharge plan and person centered care plan will be provided at transition, or as quickly as possible thereafter.  The Housing Contractor, Health Home, or Managed Long Term Care Plan will make arrangements to prevent or supplement for any gaps in necessary services or benefits.  If an NYC Adult Home Resident is enrolled in Assertive Community Treatment (ACT) or Assisted Outpatient Treatment (AOT) prior to transition, the established care management relationship will be not disrupted and the ACT or AOT care manager will be responsible for utilizing the established process for transitioning the NYC Adult Home Resident, if desired by the resident.

## C.  TRANSITION METRICS

1. During each six-month period beginning on March 1, 2018, the State shall transition a number of NYC Adult Home Residents equal to the number of NYC Adult Home Residents living in adult homes who have an active HRA approval to transition at the beginning of the six-month period, minus:

    a. The number of NYC Adult Home Residents whose Care Manager, Housing Contractor or Peer Bridger has documented the NYC Adult Home Resident's informed choice to remain in the Adult Home, provided that the State is in compliance with its obligation to provide the resident with person-centered care planning per section B(2)(e) of this Supplement and section G of the Agreement, and has offered the resident the opportunity to visit at least one apartment that meets his or her needs, hopes and desires as set forth in his or her person-centered care plan and transition plan per section B(10) of this Supplement; and

    b. The number of NYC Adult Home Residents who are affected by circumstances that so materially impacted the ability to transition during such six-month period that it was impossible as a practical matter to transition the NYC Adult Home Resident during this time frame despite the State's diligent efforts; and

    c. The number of NYC Adult Home Residents who, despite the State's diligent efforts, have demonstrated a regular and persistent course of conduct that could not be ameliorated through engagement of the NYC Adult Home Resident and provision of services that makes it impossible as a practical matter to transition him or her during this time frame;

2. Multiplied by a percentage (65% for the periods from March 1, 2018 through August 31, 2018 and from September 1, 2018 through February 28, 2019; 85%

for the period from March 1, 2019 through August 31, 2019; and 90% in all subsequent six-month periods); and

3. Reduced by the number of NYC Adult Home Residents with an active HRA approval to transition at the beginning of the six-month period who either die or are non-transitionally discharged during the six-month period.

4. At the end of each six-month period, the Independent Reviewer will examine each instance in which an NYC Adult Home Resident is determined to fall into one or more of the categories set forth in section C(1)(a)-(c) of this Supplement and report his conclusions to the parties and the Court.

## D. QUALITY ASSURANCE AND PERFORMANCE IMPROVEMENT

1. The State shall implement a Quality Assurance and Performance Improvement process to ensure that it collects and analyzes data regarding the transition process pursuant to the Agreement and this Supplement to the Agreement, takes appropriate action based on that analysis, and conducts case reviews in certain circumstances.

2. **Data Collection and Reporting.** The State shall compile and analyze data to determine the efficacy of the transition process. The State may make adjustments to its data collection and reporting processes after obtaining the consent of the Plaintiffs and the Independent Reviewer. Beginning April 1, 2018 the data collected and analyzed shall include the following:

   a. The number of NYC Adult Home Residents declining assessments and the points in the transition process at which they do so: at in-reach; at the time of assessment; or at the time of re-assessment after their initial assessment expires;

   b. The number of NYC Adult Home Residents declining transitions and the points at which they do so: at in-reach; after assessment; or after HRA approval;

   c. The number of individuals assessed not to have serious mental illness;

   d. The number of NYC Adult Home Residents assessed as ineligible for Supported Housing and instead recommended for Community Housing Other than Supported Housing or recommended to stay in an adult home;

   e. Data regarding:

      i. The time between when individuals with SMI are admitted to adult homes and when they receive their first in-reach contact following admission;

      ii.   The time between when NYC Adult Home Residents are referred for assessment and when they are assigned a Care Manager at a 12:1 ratio pursuant to section B(2)(e) of this Supplement;

     iii.   The time between when NYC Adult Home Residents are referred for assessment and when their assessments are conducted or closed out pursuant to sections B(3) and B(4) of this Supplement;

     iv.   The time between completion of assessments and submission of assessment packages to HRA for approval;

     v.   The time between submission of assessment packages to HRA and HRA's approval of assessment packages;

     vi.   The time between HRA approval and submission of housing referrals to Housing Contractors;

     vii.   The time between receipt of a housing referral and an intake interview by the Housing Contractor to begin the placement process; and

     viii.   The time between housing intake interview and transition; and

    f.   Trends in Non-Transitional discharges:

     i.   The number of NYC Adult Home Residents who are non-transitionally discharged;

     ii.   The adult homes from which NYC Adult Home Residents are non-transitionally discharged; and

     iii.   The settings to which those individuals have transitioned.

3.   Beginning with the report of the quarter that ends June 30, 2018, the State shall include in its quarterly reports to the Court the data collected, its analysis of the data, and any remedial measures taken as a result of the analysis pursuant to section D(2)(a)-(f) of this Supplement.

4.   **Quarterly Reviews.**  The State shall, on a quarterly basis, conduct a review of a sample of NYC Adult Home Residents in order to examine fidelity to the policies and processes for transitioning NYC Adult Home Residents, and analyze and report on its findings to the United States, Class Counsel, the Independent Reviewer and the Court.  The State shall review and analyze, among other things:

    a.   A random sample of 10% of all assessments performed during the previous quarter;

b. At least twelve person-centered care plans, randomly selected from a cross-section of Health Homes and Care Management Agencies, performed during the previous quarter to determine whether or not the care plans reflect the NYC Adult Home Residents' current goals and interests and how they envision life in the community;

c. All cases in the previous quarter where a NYC Adult Home Resident who has transitioned asks to move to Community Housing Other than Supported Housing or to return to an adult home within the first six months after transition;

d. At least twelve randomly selected cases per quarter where NYC Adult Home Residents have not been transitioned to Supported Housing within six months after receiving HRA approval (or, if there are fewer than twelve such cases in a quarter, all such cases); and

e. At least twelve randomly selected cases where NYC Adult Home Residents have declined transition after assessment (or, if there are fewer than twelve such cases in a quarter, all such cases).

5. **Case Review Committee.**  The State shall create a Case Review Committee, composed of representatives of the State, the United States, Class Counsel, and the Independent Reviewer, to address and resolve individual cases that require further attention.

a. **Review of Assessment Results.**  In the cases of (i) all assessments determining that an NYC Adult Home Resident is appropriate for Community Housing Other than Supported Housing or to stay in an adult home; (ii) all assessments determining that an individual does not have Serious Mental Illness; and (iii) all instances where a resident or counsel for the United States or the plaintiff class disputes the results of the conducted assessment, the Case Review Committee will review the assessment and all documentation on which the assessment was based to determine the accuracy of the assessment.  As part of the review of all assessments resulting in the recommendation of Community Housing Other than Supported Housing or where the recommendation is for the NYC Adult Home Resident to remain in the adult home, the Case Review Committee will specifically seek to determine whether or not a referral to Assertive Community Treatment and/or other community-based services set forth in section J of the Agreement would enable a different assessment outcome.

b. If, following its review of an assessment, the Case Review Committee unanimously agrees on the proper outcome of the assessment, the Committee will make that recommendation to the assessor who conducted the assessment.  If the Case Review Committee does not reach unanimous agreement on the proper outcome of the assessment, or if the

9

original assessor refuses to revise the assessment following the Case Review Committee's recommendation, then at the request of the Plaintiffs or the Independent Reviewer, a New York State Office of Mental Health clinician with appropriate credentials and training will conduct a new assessment of the individual. The results of the new assessment will not be subject to further review by the Case Review Committee.

    c.  **Review of Certain Cases.** For all cases in which an NYC Adult Home Resident (i) has not been assessed within 120 days after he or she is referred for assessment; (ii) has not been enrolled in care management at a 12:1 ratio or the creation of a person-centered care plan has not begun within 90 days after he or she is referred for assessment; (iii) has not had an HRA application, including a completed assessment, sent to HRA for approval within five days of the assessment being completed; or (iv) does not transition out of the adult home within 180 days of HRA approval, the State shall provide the Independent Reviewer, counsel for the United States, and Class Counsel a brief explanation of why the performance metric was not met. The Case Review Committee will then conduct a full review of the case if the Independent Reviewer, counsel for the United States, or Class Counsel requests that it do so. The purpose of the review will be to identify factors that contributed to delays in those residents being assessed, enrolled in 12:1 care management, or transitioned to placements in the community.

6.  **Post-Transition Incident Reporting and Review.** Within 60 days of the Effective Date, the State shall evaluate all Health Homes', Managed Long Term Care Plans', and Housing Contractors' incident reporting policies and procedures and ensure that within 90 days of the Effective Date, all Health Homes, Managed Long Term Care Plans, and Housing Contractors in this case promptly report to the State any incident or condition that jeopardizes the ability of a transitioned individual who is enrolled in Adult Home Plus care management to remain stably housed in Supported Housing, endangers his or her health or safety, or results in the individual's death. The following instances will trigger reporting to the State:

    a.  Unsafe or unsanitary living conditions that jeopardize the ability of a transitioned individual to remain stably housed in Supported Housing, endanger his or her health or safety, or result in the individual's death;

    b.  A transitioned individual's death while living in Supported Housing;

    c.  Circumstances that jeopardize a transitioned individual's ability to remain stably housed by placing him or her at risk of eviction;

    d.  Insufficient basic life necessities, including food or medications, which jeopardize the ability of a transitioned individual to remain stably housed

10

in Supported Housing, endanger his or her health or safety, or result in the individual's death;

   e.  A transitioned individual's repeated crisis episodes, including two or more ER visits or psychiatric hospitalizations within a twelve-month period; or

   f.  A transitioned individual's request to move back to an Adult Home or from Supported Housing to Community Housing Other than Supported Housing.

7.  The State shall investigate, analyze, and make reasonable attempts to correct and prevent a recurrence of situations reported pursuant to section D(6) of this Supplement.  For each such incident, the State shall report to the Independent Reviewer, Class Counsel, and counsel for the United States the name of the Health Home, Managed Long Term Care Plan, or Housing Contractor, the type of incident, the outcome for the individual, any technical assistance or guidance provided to the Health Home, Managed Long Term Care Plan, or Housing Contractor, and any remedial measures taken by the State or any of its contractors.

8.  In cases in which transitioned individuals have died while living in Supported Housing, the State shall conduct a quality assurance review of the individual's care.

9.  Beginning no more than 120 days after the Effective Date, the State's quarterly reports shall also include aggregate data and analysis regarding each of the reporting categories listed in section D(6) of this Supplement.

E.  **ADDRESSING DISCOURAGEMENT AND INTERFERENCE**

1.  **Access to Adult Homes by Settlement Implementation Providers and Privacy for Class Members.**  The State shall ensure that all Settlement Implementation Providers have access to all NYC Impacted Adult Homes and are able to do their work unimpeded.

2.  **Reporting by Settlement Implementation Providers.**  The State shall ensure that all Settlement Implementation Providers will report to the State immediately, or as soon as is practicable, if adult home operators, administrators, staff, or others: (a) impede or obstruct their access to NYC Adult Home Residents; (b) impede or prevent use of adult home common areas for group and individual meetings; (c) prohibit meeting with NYC Adult Home Residents in their rooms; (d) fail to allow visits with NYC Adult Home Residents; (e) interfere with NYC Adult Home Residents' private communications with Settlement Implementation Providers; (f) attempt to influence NYC Adult Home Residents' decisions about where to live or what services to receive; (g) employ dilatory tactics that frustrate efficient implementation of the settlement; or (h) in any other way, that Settlement Implementation Providers are aware of, limit or violate NYC Adult

11

Home Residents' rights under 18 NYCRR 485.14, 18 NYCRR 487.5(a), or 18 NYCRR 487.11(l)(12).

3. **Complaint Intake and Rapid Response.**  The State shall establish a point of contact within the Department of Health to address reports of interference and discouragement, including but not limited conduct described in section E(2) of this Supplement, and shall provide the point of contact's information to all Settlement Implementation Providers.  Settlement Implementation Providers shall share Mobilization for Justice's intake line number with NYC Adult Home Residents who report that they have encountered interference or discouragement.

4. **Complaint Investigation and Tracking.**  Upon receiving a report of interference or discouragement, the State shall promptly investigate, if necessary, and address all allegations of discouragement or patterns of discouragement in any NYC Impacted Adult Home, including those described in section E(2) of this Supplement.  The State shall maintain a database of all reports of interference or discouragement, the investigation of the reports, and the actions taken in response to the reports.  The State shall analyze the database to identify specific practices and patterns of interference and discouragement, and shall determine remedies to problems identified through that process.  The process of investigating allegations of interference or discouragement pursuant to this paragraph is distinct from, and may or may not be accompanied by, an investigation pursuant to the process set forth in SSL 461-a and 18 NYCRR 487.

5. **Reporting.** The State shall notify the Independent Reviewer, counsel for the United States, and Class Counsel on a monthly basis of any reports or concerns about interference and discouragement.  It shall report on the results of each investigation pursuant to section E(4) of this Supplement, including any corrective action taken or why corrective action was not required.  Such reporting shall include analysis of any patterns of interference or discouragement.  In its quarterly reports to the Court, the State shall report the results of all such investigations, any corrective action taken, and if no corrective action was taken, the reasons why corrective action was not required.  The State shall track, and report twice per month, all Notices of Termination of Admission Agreements for NYC Adult Home Residents.

## F.  PROCESS ENHANCEMENTS TO BETTER ACHIEVE THE GOALS OF THE AGREEMENT

1. As set forth in the Agreement, "the State and Plaintiffs intend that the measures required pursuant to [the] Agreement will provide residents of Impacted Adult Homes in New York City who have serious mental illness with the opportunity to live in the most integrated setting and will ensure that they are provided with the information necessary to allow them to make informed choices about those opportunities."  Second Amended Stip. and Order of Settlement at 3.  In furtherance of that goal, the parties have agreed on the following additions to the processes set forth in the Agreement.

2. **Peer Bridger Program.**  The State shall coordinate with Housing Contractors to subcontract with entities run by trained peers ("peer-run agencies") to establish a Peer Bridger Program.

    a.  Peer Bridger services shall be provided by trained Peer Bridgers, with the goal of developing mentoring relationships with NYC Adult Home Residents regarding community integration and transitioning to Supported Housing.  These services shall include establishing relationships with NYC Adult Home Residents through motivational interviewing; high and consistent frequency of visits to NYC Impacted Adult Homes; time spent accompanying NYC Adult Home Residents into the community; time spent with transitioned former NYC Adult Home Residents; communicating with NYC Adult Home Residents throughout the in-reach, assessment, care planning, and transition processes; running group sessions in NYC Impacted Adult Homes; and, to the extent feasible, running group sessions with NYC Adult Home Residents in the community.  To facilitate one-one-one and group community exploration by Peer Bridgers and NYC Adult Home Residents, the State shall provide peers with funding for meals, refreshments, and transportation.

    b.  Peer Bridger services shall be available to NYC Adult Home Residents throughout the in-reach, assessment, person-centered care planning, and transition processes, including Peer Bridger attendance at processes such as assessment when possible and desired by the NYC Adult Home Resident.

    c.  Each NYC Impacted Adult Home shall have at least three full-time Peer Bridgers.  In no event shall a Peer Bridger be deployed to an NYC Impacted Adult Home without a second Peer Bridger or a staff member from another Settlement Implementation Provider.  On a quarterly basis, the State shall seek feedback from Housing Contractors and peer-run agencies regarding staffing needs related to the Peer Bridger Program and adjust the number of Peer Bridgers as needed based on that feedback. The State shall report to the Independent Reviewer and Plaintiffs any feedback received regarding staffing needs related to the Peer Bridger Program.

    d.  The State shall provide the peer-run agencies with lists of NYC Adult Home Residents so that the agencies can provide the residents with Peer Bridger services.  Peer-run agencies may prioritize specific NYC Adult Home Residents to receive Peer Bridger services, so long as the individuals prioritized include a mix of individuals at different stages of the transition process, including NYC Adult Home Residents who have indicated they are not currently interested in transitioning to Supported Housing.

e. NYC Adult Home Residents who communicate to a Peer Bridger that they are willing to be assessed or to transition shall receive in-reach immediately following that communication and shall be referred for assessment on an expedited basis.

f. The State's funding of the Peer Bridger Program shall be in addition to the funding it provides to Housing Contractors for in-reach services.

g. Oversight and Training for the Peer Bridger Program

   i. The New York State Office of Mental Health shall provide centralized oversight and training of the Peer Bridger Program.

   ii. Each peer-run agency shall be funded for one or more supervisory positions.

   iii. The State shall provide thorough and on-going trainings to the Peer Bridgers and shall involve the Independent Reviewer, counsel for the United States, and Class Counsel in developing the trainings. The Peer Bridger Program trainings will include information about relevant State agencies and contracted entities, and will familiarize Peer Bridgers with the rights of NYC Adult Home Residents, including rights under 18 NYCRR 485.14, 487.5(a), and 487.11(l)(12); and rights under the Agreement and this Supplement.

   iv. The State shall ensure that Peer Bridgers have access to all NYC Impacted Adult Homes, including access to Adult Home common areas for group and individual meetings on a regular basis, the ability to visit NYC Adult Home Residents in their rooms, the ability to visit Residents, including during evenings and weekends, and all other rights under 18 NYCRR 485.14, 487.5(a), and 487.11(l)(12).

   v. The State shall establish and publicize to the Peer Bridgers a responsive contact from the Department of Health to orient the Peer Bridgers, receive and respond to reports by Peer Bridgers of discouragement and interference, and otherwise respond to concerns by Peer Bridgers about access to NYC Adult Home Residents. The State shall notify the Independent Reviewer, counsel for the United States, and Class Counsel when it receives any such reports or concerns.

h. Implementation of the Peer Bridger Program will begin immediately upon the Effective Date with the intent that NYC Adult Home Residents in each home will have access to meaningful Peer Bridger services as soon as possible. Within one year of the Effective Date, the Peer Bridger Program shall be available in all NYC Impacted Adult Homes.

14

3. **Promoting Access to Information and Supporting Class Members' Hopes, Desires, and Goals.**  In furtherance of the obligations set forth in the Agreement and this Supplement, and in recognition of the importance of supporting NYC Adult Home Residents' hopes, desires, and goals:

   a. Settlement Implementation Providers will, with respect to each NYC Adult Home Resident, individualize their efforts to engage the resident, based on their understanding of the resident's concerns, preferences, and needs; and have enough visits with and maintain sufficient contact with the resident to enable the provider to understand the resident's concerns, preferences and needs.  In addition, Settlement Implementation Providers will attempt to establish a relationship of trust with the resident, including by engaging in community activities with resident (e.g., going for coffee, going to church).  A substantial amount of in-reach and other activities in connection with the Agreement and this Supplement will be conducted during evenings and weekends.  Providers' communications and contacts with residents will not need to go through or be filtered through the adult home or adult home staff.

   b. In-Reach staff will use motivational interviewing techniques to explain the benefits of Supported Housing to NYC Adult Home Residents and will clearly explain to NYC Adult Home Residents that agreement to be assessed is not a commitment to moving.

   c. The State will make its best efforts to improve the rate of Adult Home Plus Care Managers' presence during assessments.  The Independent Reviewer will evaluate this goal in his annual reports.

   d. Settlement Implementation Providers will, wherever possible, honor NYC Adult Home Residents' housing choices and needs, *e.g.*, to live alone or with others of their choice; in the borough of their choice and within a reasonable distance of community resources and transportation; and in an apartment building that accommodates their physical or mental disabilities.

   e. Housing Contractors will use a Roommate Profile Worksheet to match potential roommates and will begin the process of matching potential roommates as soon as a NYC Adult Home Resident indicates an interest in living with a roommate.  Potential roommates will meet before transition.  No NYC Adult Home Resident will be assigned a roommate in Supported Housing or Community Housing Other than Supported Housing that he or she does not wish to live with.

   f. The State will establish a protocol for the sharing of information among Housing Contractors regarding available Supported Housing units throughout New York City, to facilitate NYC Adult Home Residents'

15

desire to reside in communities other than those served by their designated Housing Contractor.

g.  NYC Adult Home Residents' discharge plans, as documented using the Discharge Planning Tool, will contain details regarding how NYC Adult Home Residents' individual vocational, educational, social and/or spiritual needs will be met.

### G.  CLASS CAP

1.  **Class Cap Date.**  Only those NYC Adult Home Residents admitted to NYC Impacted Adult Homes on or before September 30, 2018 (the "Class Cap Date") shall be considered members of the class and therefore entitled to the relief set forth in the Agreement and this Supplement.  Individuals admitted to NYC Impacted Adult Homes after September 30, 2018 will not be entitled to the relief set forth in the Agreement and this Supplement, but the State will continue to make efforts to transition those individuals into Supported Housing as desired and appropriate.

2.  **Assessment Decision Date.**  No later than September 30, 2019 (the "Assessment Decision Date"), all NYC Adult Home Residents admitted to NYC Impacted Adult Homes prior to the Class Cap Date who wish to be assessed must have stated the desire to do so to Housing Contractor staff, a Care Manager, or a Peer Bridger.  The State will not be obligated under the Agreement or this Supplement to the Agreement to assess or transition NYC Adult Home Residents who, as of the Assessment Decision Date, have not stated that they wish to be assessed, as documented by Housing Contractor staff, the Care Manager, or a Peer Bridger.

3.  No later than March 31, 2019, the State shall issue a notice to all NYC Adult Home Residents admitted on or before September 30, 2018 regarding the Assessment Decision Date and what they must do to insure their rights under the Agreement and this Supplement.  The parties shall agree on the content of the notice on or before January 31, 2019.  The State shall make diligent efforts to ensure that all NYC Adult Home Residents admitted on or before September 30, 2018 receive the notice.

4.  The Class Cap does not, and is not intended to, prejudice the rights or claims of any person admitted to an NYC Impacted Adult Home after the Class Cap Date.

### H.  ENFORCEMENT AND TERMINATION

1.  Section M(3) of the Agreement shall govern any allegation of non-compliance with a material provision of the Agreement or this Supplement, except that during the period ending August 30, 2018, if the State has not met any of the Process Metrics or Transition Metrics set forth in sections B and C of this Supplement, the parties agree that in lieu of a non-compliance process pursuant to section M(3) of the Agreement, they will confer in good faith including taking into consideration any reasonable recommendation of the Independent Reviewer

made through this process.  This consultation will be in addition to the Quality Assurance and Performance Improvement process discussed in section D of this Supplement.

2.  The Court's jurisdiction to ensure compliance with the Agreement and this Supplement shall terminate on December 31, 2020 if, as of that date, the State has transitioned substantially all eligible NYC Adult Home Residents who are appropriate to be transitioned and has substantially complied with its other obligations as set forth in the Agreement and this Supplement.  Any violation that has subsequently been cured by providing NYC Adult Home Residents with the services the State is obligated to provide under the Agreement and this Supplement will not prevent termination of the Court's jurisdiction over the Agreement and this Supplement.

3.  The Parties may agree to jointly ask the Court to terminate the Agreement and this Supplement earlier than December 31, 2020.

4.  Upon 30 days' notice to the Plaintiffs and the Independent Reviewer, the State may move to terminate the Agreement and this Supplement earlier than December 31, 2020.

5.  Section M(2)(a)-(b) of the Agreement shall govern the termination of the Agreement and this Supplement and any party's objection to the termination of the Agreement and this Supplement, except that references to the Independent Reviewer's "fifth and final report" are hereby amended to refer to the Independent Reviewer's "seventh and final report."

## I.  MISCELLANEOUS

1.  Section N(2) of the Agreement is hereby amended as follows:  During the term of this Agreement it is anticipated that Plaintiff Class will incur certain legal fees, and other costs and disbursements, including fees to retain outside experts. Plaintiffs, Plaintiff Class and counsel for the Plaintiff Class agree to limit all such claims for reimbursement for attorneys' fees, costs and disbursements to what is directly and reasonably necessary, up to a combined total, which shall not exceed $75,000 per year up to June 30, 2017, and from July 1 forward which shall not exceed $225,000 per year, calculated on the basis of a 365-day year and ending on the date this Agreement expires under Section M.2.  The reimbursement amount will be ratable for the year in which the agreement is terminated.  During the term of this Agreement, Counsel for the Plaintiff Class agree to submit vouchers and contemporaneous time records to defendants' counsel on a quarterly basis for any such attorneys' fees, costs and disbursements and defendants agree to reimburse counsel for the Plaintiff Class within one hundred twenty (120) days of receipt of such vouchers.  If payment is delayed beyond one hundred twenty (120) days defendants will also pay interest at the rate set forth in 28 U.S.C. § 1961, which shall accrue beginning on the one hundred twenty-first day.  The foregoing payment(s) shall be made payable to Disability

Advocates, Inc. and sent to Disability Advocates, Inc. DBA Disability Rights New York, 5 Clinton Square, Albany, NY 12207, or in the event its offices shall relocate to its then current address.

2.  Section L(3) of the Agreement is hereby amended as follows:  The annual budget for the Reviewer shall be $350,000.00.  All reasonable fees, costs and expenses of the Reviewer, including the cost of any consultants or staff hired by the Reviewer, shall be borne by the State up to the amount of this annual budget. The Reviewer shall provide a monthly accounting justifying the fees, costs and expenses.  In the event of significant changes in circumstances and responsibilities from those initially required by the Agreement that result in the Independent Reviewer having to spend substantially more time or incur substantial and unforeseen expenses, the Independent Reviewer may seek approval by the State for an amendment to the budget and submit a justification for such amendment. Approval of the proposed amendment shall not be unreasonably withheld and the State shall respond to the request of the Independent Reviewer within 30 days.  Any unspent balance at the end of each year shall be added to the annual budget for the following year and be available to cover the fees and expenses of the Independent Reviewer's office.

3.  This Supplement may be executed in counterparts, and each counterpart, when executed shall have the full efficacy of a signed original.  Photocopies of such signed counterparts may be used in lieu of the originals for any purpose.

4.  The undersigned representative of the Defendants certifies that he is authorized to enter into the terms and conditions of this Supplement and to execute and bind legally such Defendants to this document.

5.  Each undersigned representative of Plaintiffs certifies that he or she is authorized to enter into the terms and conditions of this Supplement and to bind legally the Plaintiff to this document.

For Plaintiff UNITED STATES OF AMERICA:

Dated: ___3|8|2018___

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

By:  MICHAEL J. GOLDBERGER
Assistant United States Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, NY 11215

JOHN M. GORE
Acting Assistant Attorney General
Civil Rights Division

ALBERTO RUISANCHEZ
Acting Deputy Assistant Attorney General
Civil Rights Division

REBECCA B. BOND, Chief
AMANDA MAISELS, Deputy Chief
Disability Rights Section
Civil Rights Division

ELIZA DERMODY
JENNIFER BRONSON
VICTORIA THOMAS
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW – NYA
Washington, DC 20530

19

For the Plaintiff Class:

Dated: March 8, 2018

Andrew G. Gordon
Geoffrey Chepiga
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

Cliff Zucker
Nina Loewenstein
DISABILITY RIGHTS NEW YORK
725 Broadway, Suite 450
Albany, NY 12207

Roberta Mueller
NEW YORK LAWYERS FOR THE PUBLIC
INTEREST, INC.
151 West 30th Street, 11th floor
New York, NY  10001-4007

Ira A. Burnim
Jennifer Mathis
BAZELON CENTER FOR MENTAL
HEALTH LAW
1105 15th Street, N.W., Suite 1212
Washington, DC  20005

Jeanette Zelhof
Kevin Cremin
Jota Borgmann
Daniel Ross
MOBILIZATION FOR JUSTICE
299 Broadway, 4th floor
New York, NY 10007

For the Plaintiff Class:

Dated: __3 |8|2018__

_____
Andrew G. Gordon
Geoffrey Chepiga
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

_____
Roberta Mueller
NEW YORK LAWYERS FOR THE PUBLIC
INTEREST, INC.
151 West 30th Street, 11th floor
New York, NY  10001-4007

_____
Cliff Zucker
Nina Loewenstein
DISABILITY RIGHTS NEW YORK
725 Broadway, Suite 450
Albany, NY 12207

_____
Ira A. Burnim
Jennifer Mathis
BAZELON CENTER FOR MENTAL
HEALTH LAW
1105 15th Street, N.W., Suite 1212
Washington, DC  20005

_____
Jeanette Zelhof
Kevin Cremin
Jota Borgmann
Daniel Ross
MOBILIZATION FOR JUSTICE
299 Broadway, 4th floor
New York, NY 10007

For the Plaintiff Class:

Dated: _____

| | |
|---|---|
| Andrew G. Gordon<br>Geoffrey Chepiga<br>PAUL, WEISS, RIFKIND, WHARTON &<br>GARRISON LLP<br>1285 Avenue of the Americas<br>New York, NY  10019-6064 | Cliff Zucker<br>Nina Loewenstein<br>DISABILITY RIGHTS NEW YORK<br>725 Broadway, Suite 450<br>Albany, NY 12207 |
| Roberta Mueller<br>NEW YORK LAWYERS FOR THE PUBLIC<br>INTEREST, INC.<br>151 West 30th Street, 11th floor<br>New York, NY  10001-4007 | Ira A. Burnim<br>Jennifer Mathis<br>BAZELON CENTER FOR MENTAL<br>HEALTH LAW<br>1105 15th Street, N.W., Suite 1212<br>Washington, DC  20005 |
| | Jeanette Zelhof<br>Kevin Cremin<br>Jota Borgmann<br>Daniel Ross<br>MOBILIZATION FOR JUSTICE<br>299 Broadway, 4th floor<br>New York, NY 10007 |

For the Plaintiff Class:

Dated: 3/8/2018

---

Andrew G. Gordon
Geoffrey Chepiga
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

---

Cliff Zucker
Nina Loewenstein
DISABILITY RIGHTS NEW YORK
725 Broadway, Suite 450
Albany, NY 12207

---

Roberta Mueller
NEW YORK LAWYERS FOR THE PUBLIC
INTEREST, INC.
151 West 30th Street, 11th floor
New York, NY  10001-4007

---

Ira A. Burnim
Jennifer Mathis
BAZELON CENTER FOR MENTAL
HEALTH LAW
1105 15th Street, N.W., Suite 1212
Washington, DC  20005

---

Jeanette Zelhof
Kevin Cremin
Jota Borgmann
Daniel Ross
MOBILIZATION FOR JUSTICE
299 Broadway, 4th floor
New York, NY 10007

For Defendants, STATE OF NEW YORK, ACTING COMMISSIONER KRISTIN M.
WOODLOCK, THE NEW YORK STATE OFFICE OF MENTAL HEALTH,
COMMISSIONER NIRAV R. SHAH, THE NEW YORK STATE DEPARTMENT OF
HEALTH, and GOVERNOR ANDREW M. CUOMO:

Dated: _March 9, 2018_

_Robert L. Begleiter_
Robert L. Begleiter
Gary J. Malone
Attorneys for Defendants
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, NY 10017

**SO ORDERED**

Dated: Brooklyn, New York
_____, 2018

_____
Nicholas G. Garaufis
United States District Judge

417569.1