D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

THE UNITED STATES OF AMERICA,

                     Plaintiff,                              13-CV-4165 (NGG) (ST)

    -against-

STATE OF NEW YORK,

                     Defendant.
------------------------------------------------------------X

RAYMOND O'TOOLE, ILONA SPIEGEL, and
STEVEN FARRELL, individually and on behalf
of all others similarly situated,

                     Plaintiffs,
                                                        13-CV-4166 (NGG) (ST)

    -against-

ANDREW M. CUOMO, in his official capacity as
Governor of the State of New York, NIRAV R.
SHAH, in his official capacity as Commissioner of
the New York State Department of Health,
KRISTIN M. WOODLOCK, in her official
capacity as Acting Commissioner of the New York
State Office of Mental Health, THE NEW YORK          **MEMORANDUM & ORDER**
STATE DEPARTMENT OF HEALTH, and THE
NEW YORK STATE OFFICE OF MENTAL
HEALTH,

                     Defendants.
------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Before the court is the parties' joint motion for final approval of the Proposed Supplement to the Second Amended Stipulation and Order of Settlement (the "Supplement") (Class Dkt. 198-1.)[1] Plaintiffs Raymond O'Toole, Ilona Spiegel, and Steven Farrell ("Plaintiffs") brought this class action on behalf of themselves and a class of New York City adult home residents (the "Class"). On April 17, 2018, the court preliminarily approved the Supplement (Apr. 17, 2018, Order) and approved the notice of the Supplement to be sent to class members (Revised Order Approving Class Notice (Class Dkt. 207)). The court held a fairness hearing on June 18, 2018. (See June 19, 2018, Min. Entry.)

Having considered the statements at the fairness hearing and all written submissions, the court finds that the Class was afforded adequate notice, and the terms of the Supplement are fair, reasonable, and adequate. Accordingly, the court GRANTS the parties' joint motion for final approval of the Supplement in case No. 13-CV-4166. For purposes of the associated case No. 13-CV-4165, brought by the United States against the State of New York, the Supplement serves as a Consent Judgment and is also APPROVED.

## I.   BACKGROUND

The present cases have a lengthy history. In 2002, the *New York Times* featured a series of articles on the deplorable conditions in many New York City adult homes. The articles documented the dangerously poor care afforded residents, the vermin and squalor present in the facilities, and the mismanagement of residents' funds entrusted to administrators. See Clifford J. Levy, For Mentally Ill, Death and Misery, N.Y. Times, Apr. 28, 2002; Levy, Here, Life is

---

[1] For ease of reference, the court cites the docket corresponding to United States v. New York, No. 13-CV-4165 (NGG) as "Dkt." and cites the docket corresponding to O'Toole, et al., v. Cuomo, et al, No. 13-CV-4166 (NGG) as "Class Dkt."

Squalor and Chaos, N.Y. Times, Apr. 29, 2002; Levy, Voiceless, Defenseless and Source of Cash, N.Y. Times, Apr. 30, 2002.[2]

In 2003, Disability Advocates, Inc., brought suit to vindicate the rights of individuals with mental illness residing in, or at risk of entry into, New York City adult homes. See Disability Advocates, Inc. v. Paterson, et al., No. 03-CV-3209 (NGG) ("DAI").[3] Following years of litigation including extensive discovery, multiple expert reports, and a five-week bench trial, the court found that the State had violated the Americans with Disabilities Act of 1990 and the Rehabilitation Act by failing to serve adult home residents in the most integrated setting appropriate to their needs. Mem. & Order re Findings of Fact & Concs. of Law, DAI, 653 F. Supp. 2d 184, 314 (E.D.N.Y. Sept. 8, 2009). The court gave the State an opportunity to submit a proposed remedy to address these civil rights violations. Finding the State's proposal to be "egregiously deficient," the court subsequently adopted the plaintiff's remedial proposal with minor modifications and, over the State's objections, appointed a court monitor to oversee implementation of the remedy. Mem. & Order re Remedial Order & J., DAI, No. 03-CV-3209 (NGG), 2010 WL 786657, *1, 7 (E.D.N.Y. Mar. 1, 2010). The State appealed, and the Second Circuit vacated the court's decision on the grounds of standing but did not question the factual or legal findings on the merits. See Disability Advocates, Inc. v. N.Y. Coalition for Quality

---

[2] Some of the articles' findings had been previously highlighted in a 1979 investigation by the Deputy Attorney General. See Charles J. Hynes, Private Proprietary Homes for Adults: A Second Investigative Report (1979). Multiple studies and reports since that time further documented the ongoing problems with adult homes and concluded that they are not conducive to rehabilitation or care of persons with mental illness. See Lloyd I. Sederer, Chief Med. Officer, Office of Mental Health, Clinical Advisory (2012); N.Y. State Adult Care Facilities Workgroup, Report Submitted to the Commissioner, Department of Health (2002); N.Y. State Comm'n on Quality of Care for the Mentally Disabled, Exploiting Not-For-Profit Care in an Adult Home: The Story Behind Ocean House Center, Inc. (2001); N.Y. State Comm'n on Quality of Care for the Mentally Disabled & Mental Hygiene Rev. Bd., Adult Homes Serving Residents with Mental Illness: A Study of Conditions, Services, and Regulations (1990).

[3] The subject matter of DAI was essentially the same as the present cases, and in that action, plaintiff Disability Advocates, Inc., was represented by the five legal organizations that here, collectively with Disability Rights New York, serve as Class Counsel.

Assisted Living, Inc., 675 F.3d 149, 162-63 (2d Cir. 2012). The parties then negotiated a settlement (the "Original Settlement") in the aftermath of the Second Circuit's ruling.

The court recounts this history to provide context for this Memorandum and Order concerning the Supplement. While the court applauds the settlement reached by the parties, it notes that it has required decades of investigations, litigation, and settlement negotiations to compel the State to provide adult home residents what is due under the law. Relief for these residents is long overdue, and the court considers this delay to be unconscionable.[4]

### A. The Present Cases

On July 23, 2013, the United States filed an enforcement action against the State of New York for failing to provide individuals with mental illness residential opportunities in the "most integrated setting" suited to their needs, as required by Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12134 ("ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and their implementing regulations (as interpreted in Olmstead v. L.C., 527 U.S. 581 (1999)). (Compl. (Dkt. 1).) Plaintiffs simultaneously filed, on behalf of themselves and a class of individuals with serious mental illness who reside in 23 "impacted" adult homes[5] in New York City, an action for injunctive and declaratory relief on the same grounds. (Class Compl. (Class Dkt. 1).) The two cases were consolidated and assigned to this court. (Aug. 20, 2013, Min. Entry.) The parties immediately filed a joint proposed Stipulation and Order of Settlement. (Dkt. 5; Class Dkt. 5.) On November 20, 2013, the court certified the class as:

---

[4] Nonetheless, the court commends the State of New York and the coalition of plaintiffs, their counsel, and the Justice Department for their diligent efforts to resolve this controversy.

[5] An "impacted" home is one in which at least 25% of the residents or twenty-five residents (whichever is fewer) have a mental illness. See N.Y. Exec. Law § 553.10 (McKinney 2013). The 23 impacted adult homes are Belle Harbor Manor, Brooklyn Adult Care Center, Central Assisted Living, LLC, Elm York LLC, Garden of Eden Home, Harbor Terrace Adult Home and Assisted Living, Kings Adult Care Center, Lakeside Manor Home for Adults, Mermaid Manor Home for Adults, New Gloria's Manor Home for Adults, New Haven Manor, Oceanview Manor Home for Adults, Park Inn Home, Parkview Home for Adults, Queens Adult Care Center, Riverdale Manor Home for Adults, Rockaway Manor Home for Adults, S.S. Cosmas and Damian Adult Home, Sanford Home, Seaview Manor LLC, Surf Manor Home for Adults, Surfside Manor Home for Adults, and Wavecrest Home for Adults.

> All individuals with serious mental illness who reside in impacted adult homes in New York City with a certified capacity of 120 or more beds and a mental health census of 25 percent or more of the resident population or 25 persons, whichever is less.

(See Nov. 20, 2013, Order at 3-4; Mem. in Supp. of Pls. Mot. for Class Cert. (Class Dkt. 14) at 1.) The court also granted preliminary approval of the Original Settlement, approved the class notice, and appointed as Class Counsel Paul, Weiss, Rifkind, Wharton & Garrison LLP; Disability Advocates, Inc. (now doing business as Disability Rights New York); The Bazelon Center for Mental Health Law; New York Lawyers for the Public Interest, Inc.; MFY Legal Services; and the Urban Justice Center. (Nov. 20, 2013, Order at 3-4.)

Finding the Original Settlement to be fair, reasonable, and adequate, and also finding the attorney's fees to be reasonable, the court then granted Plaintiffs' Motion for Final Approval of the Proposed Settlement Agreement and Attorney's Fees on March 17, 2014. (Order Granting Motion for Settlement (Class Dkt. 59).)

**B.     The Original Settlement**

The Original Settlement required substantially the same relief as contained in the court's remedial order in the DAI litigation. Under the terms of the Original Settlement, within five years, the State was required to provide class members the opportunity to move into supported housing. (Amend. Stip. & Order of Settlement ("Settlement") (Dkt. 23; Class Dkt. 53) § I(1).) The State would provide a minimum of 2,000 supported housing units for current adult home residents, and any additional units that are necessary. (Id. § D(1)-(2).) Adult home residents would have the opportunity to undergo individual assessments to evaluate their eligibility for supported housing, identify housing in the most integrated setting appropriate for their needs, and determine what mental health services they would need in this setting. (Id. § F.) To help adult home residents make an informed decision about whether to move, supported housing

5

providers would conduct "in-reach" to explain the benefits of supported housing, detail the options available, and address any concerns. (Id. § E.) Eligible residents who chose to transition into supported housing or other housing that was appropriate to their needs would receive services to aid with their move and transition into the community. (Id. § J.) The Original Settlement did not require any individual to move or undergo assessment against his or her will. (Pls. Pre-Hr'g Mem. of Law in Supp. of Mot. for Final Approval of the Proposed Settlement and Atty's Fees ("Pls. Mem.") (Class Dkt. 31) at 7; Pls. Feb. 4, 2014, Letter (Class Dkt. 54) at 3-4.)

Implementation of the settlement would be monitored by the court and an Independent Reviewer. (Settlement § L(1).) Clarence Sundram, an experienced disability rights advocate who had served in a similar role in other cases, would serve as the Independent Reviewer. (Id.; Pls. Feb. 4, 2014, Letter at 4-5.) He and any staff or consultants would work with the parties to resolve disputes that arose during implementation and could communicate with the court about progress, provided he submitted a written summary of such communications to the parties after the fact. (Settlement §§ L(6), L(17).) The parties would submit quarterly progress reports to the court about implementation of the settlement. (Id. § K(1).) Mr. Sundram would submit five annual reports to the court about the State's compliance with the settlement. (Id. § L(13).) The court would retain jurisdiction to enforce the settlement until 60 days after the final annual report by the Independent Reviewer. (Id. § M(2).)

### C. Progress Under the Original Settlement from 2014-2018, and the Current Proposed Supplement

We have reached the current point—where the parties have submitted a motion to approve the Supplement—because progress under the Original Settlement was slow. The goal of the Supplement is to bring about improvements by simultaneously (1) providing the individuals with mental illness a more accountable and measurable rate of implementation of the substantive

6

reforms they are seeking, and (2) providing the State with a more concrete commitment that has a clear end in sight.

The court has previously reviewed the Supplement and granted preliminary approval. Here, the court provides a brief summary of some—but not all—of its key points. Under the Supplement:

- The assessment process will be changed by lodging responsibility for the assessments with the Housing Contractors. This should simplify and streamline the process and reduce the number of people and agencies with whom class members have to interact.

- The State will implement a program of Peer Bridgers—persons with mental illness who live in the community—who will be present in the adult homes to work with current residents throughout the process of in-reach, assessment, planning, and transition to the community. At least three fulltime peers will be assigned to each of the impacted adult homes and will work closely with the Housing Contractor staff.

- The agreement sets specific timelines for various tasks to be performed, and thresholds for compliance.

- The agreement sets forth specific transition metrics to be measured every six months, with the Independent Reviewer reviewing and reporting upon compliance to the parties and the court.

- The agreement creates a new Quality Assurance and Performance Improvement process, which requires the collection, analysis, and reporting from various data pertaining to compliance with the metrics described above. These will be included in the quarterly reports submitted to the parties and the court.

- There are new provisions addressing discouragement and interference by adult home providers, including a new complaint investigation and tracking system.

- The State agreed to increase the amount of reimbursable attorneys' fees from $75,000 per year to $225,000 per year, reflecting the additional work of Plaintiffs. The Supplement also recognizes the right of the Independent Reviewer to request an amendment of the existing budget to cover additional costs created by the new duties imposed by the Supplement.

- The State has committed substantial additional funding to implement the new assessment process and the Peer Bridger program, with six million dollars provided in the Governor's Executive Budget.

- The parties agreed upon a cap on the class as of September 30, 2018. Individuals who are admitted to the impacted adult homes after that date will not be entitled to relief under the Supplement, but the State will continue to make efforts to transition those individuals into supported housing as desired and appropriate. No later than September 30, 2019, class members who wish to be assessed must make their decision known and the State will not be obligated to assess or transition class members who do not indicate their desire by this date. The Supplement provides for notice to the class to be provided no later than March 31, 2019, of these provisions. It is important to note that class members admitted prior to September 30, 2018, will be receiving in-reach to individually inform them of their rights and their option to move to supported housing. The Supplement provides that it does not and is not intended to prejudice the rights or claims of persons admitted to impacted adult homes after September 30, 2018.

- The court's jurisdiction to ensure compliance with the agreement will terminate on December 31, 2020, if, as of that date, the State has transitioned substantially all eligible class members who are appropriate to be transitioned and has substantially complied with its other obligations as set forth in the Original Settlement and the Supplement. The parties may jointly ask the court to terminate the Original Settlement and Supplement earlier than December 31, 2020.

**D.   Notice of Supplement and Fairness Hearing**

Following the court's preliminary approval of the Supplement, Defendants' counsel mailed over 4,300 copies of the revised notice (Class Dkt. 206) to class members on April 30, 2018. (Fairness Hr'g Tr. (undocketed) at 7.) Defendants' counsel then re-sent an additional number of notices shortly thereafter. (Id.) Defendants' counsel also sent a "Dear Administrator" letter to the adult homes on May 29, 2018, and the State Department of Health made calls to the adult homes on June 1, 2018, and on June 5, 2018, regarding the posting of all pages of the notice. (Id. at 8.) Despite these actions, Plaintiffs' counsel reported hearing from class members at nine of the adult homes that there were problems with the posting or delivery of the notice to class members. (Id.)

In response, Defendants sent staff from the Department of Health to visit the cited adult homes in an attempt to investigate and remedy the problems. (Id.) Clarence Sundram, the Independent Reviewer, then sent his staff to the remaining homes to investigate the distribution

of the notice. (Id.) Mr. Sundram's staff found that "[w]hile most of the adult homes had properly displayed the notices and had effective procedures for the delivery of mail to their residents, nonetheless [they] found problems at three additional adult homes." (Id.) Furthermore, Plaintiffs' expert, Elizabeth Jones, reported similar problems during her visits to the adult homes. (Id.)

Despite the problems reported, however, these visits provided a substantial remedy to the problems identified, and, despite the initial problems, the notice was ultimately, by and large, distributed effectively.

On June 18, 2018, the court held a fairness hearing to give class members the opportunity to express their views on the Supplement. Prior to the hearing, 36 class members registered to speak, and 18 class members gave statements at the hearing. In addition, the court invited "anyone else who's a member of the class who wishes to be heard" to give a statement. (June 18, 2018, Fairness Hr'g Tr. at 59.) The court also received thirty written submissions from class members. (Pls. July 26, 2018, Letter, Ex. 1 (Class Dkt. 213-1).) Class Counsel also transmitted to the court three additional letters received from class members about their views on the Supplement. (Pls. Aug. 29, 2018, Letter, Ex. 1 (Class Dkt. 217-1).)

It is clear to the court that adult home staff exerts a high degree of control over the residents' lives. (See Chepiga Decl. Ex. 4 (Dkt. 50) at 7, 224.) Some class members were distrustful of or intimidated by the staff and feared retaliation for expressing their views about the Original Settlement. (See Pls. Feb. 4, 2014, Letter at 7.) For this reason, residents who spoke at the fairness hearing were identified by number only (see Revised Order Approving Class Notice), their names have been withheld or redacted from the transcript, and written submissions from adult home residents have been kept under seal.

9

In the many oral and written statements submitted to the court, class members overwhelmingly expressed support for the proposed settlement. Class members described their feelings of confinement, mental deterioration, and unhappiness in adult homes; some class members also reported dangerous or unsanitary living conditions in their adult homes; some reported coping with vermin infestations; some reported being attacked by other residents; and many complained of a lack of privacy and of the quality of the food in their adult homes. (See, e.g., Fairness Hr'g Tr. at 50; Pls. July 26, 2018, Letter, Ex. 1 at 56.) They supported the settlement because it offered an opportunity to be more independent and enjoy the simple joys many people take for granted: for example, living without an assigned roommate or cooking their own meals.

The court received objections to the Supplement from a few class members. (See, e.g., Fairness Hr'g Tr. at 41; Pls. July 26, 2018, Letter, Ex. 1 at 4, 34, 40, 51, 56, 64.) These are discussed below.

## II.   DISCUSSION

### A.   Adequacy of Notice

The standard for whether notice in a class action is adequate under Federal Rule of Civil Procedure 23(e) is reasonableness. See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 113-14 (2d Cir. 2005). A notice is reasonable if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." Id. at 114 (quoting Weinberger v. Kendrick, 698 F.2d 61, 70 (2d Cir. 1982)). "Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice so long as class counsel acted reasonably in choosing the means likely to inform potential class members."

In re Merrill Lynch Tyco Research Sec. Litig., 249 F.R.D. 124, 133 (S.D.N.Y. 2008) (citing Weigner v. City of New York, 852 F.2d 646, 649 (2d Cir. 1988)).

The court finds that notice was adequate, both in its content and its dissemination. The revised notice communicated the terms of the settlement in clear, simple language and provided points of contact for class members' questions or requests for transportation assistance. It provided easy-to-understand instructions about how to submit written comments regarding the Supplement or arrange to speak at the fairness hearing. Given the large number of class members and varying levels of comprehension and ability among the class, the simple and direct notice was "the best notice practicable under the circumstances." Id.

Despite initial problems that arose during the distribution of the notice, the court finds that the ultimate methods of delivery were adequate. The parties' troubleshooting efforts to ensure delivery to class members in each adult home were "likely to inform potential class members." Id. Therefore the court finds that the parties have complied with Rule 23(e)'s notice requirements.

### B.     Approval of the Settlement

Federal Rule of Civil Procedure 23(e) provides that "the court may approve [a proposed settlement] only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A court must examine both the negotiation process and the settlement's substantive terms to determine its fairness. D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001).

#### 1.     Procedural Fairness: The Negotiation Process

In assessing the procedural fairness of the settlement, the court looks to whether the agreement was the product of "arm's-length negotiations and that plaintiffs' counsel have

11

possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." Id. (quoting Weinberger, 698 F.2d at 74).

There is strong evidence that settlement negotiations were serious and deliberate. The Supplement was a product of more than fifteen months of negotiations, in addition to prior rounds of settlement discussions that took place during the negotiation of the Original Settlement and during the predecessor DAI litigation. Throughout, Plaintiffs have been represented by a team of capable attorneys from six legal organizations who collectively serve as Class Counsel. They are experienced in class actions generally and had specific experience in this matter from litigating the DAI case. The United States, represented by attorneys from the Department of Justice and the U.S. Attorney's Office for the Eastern District of New York, also participated in negotiations, bringing with it additional experience with Olmstead settlements. (Pls. Mem. at 3-4.) The Supplement benefitted from information the parties acquired during discovery and trial in DAI, including expert reports, witness testimony, and the court's prior opinions. (Id. at 4.) Based on the foregoing, the court is satisfied that the Supplement is the product of serious and deliberate negotiations between experienced and informed counsel who zealously represented their clients' interests.

    2.    <u>Substantive Fairness: Fairness, Reasonableness, and Adequacy</u>

To grant final approval of a proposed settlement, the court must find that its terms are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In <u>City of Detroit v. Grinnell Corp.</u>, the Second Circuit developed nine factors to consider in making this determination:

>(1) the complexity, expense and likely duration of the litigation;
>
>(2) the reaction of the class to the settlement;
>
>(3) the stage of the proceedings and the amount of discovery completed;

>   (4) the risks of establishing liability;
>
>   (5) the risks of establishing damages;
>
>   (6) the risks of maintaining the class action through the trial;
>
>   (7) the ability of the defendants to withstand a greater judgment;
>
>   (8) the range of reasonableness of the settlement fund in light of the best possible recovery;
>
>   (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000). "A court need not find that every factor militates in favor of a finding of fairness; rather, a court considers the totality of these factors in light of the particular circumstances." See In re Merrill Lynch, 249 F.R.D. at 143 (citation and quotation marks omitted).

### a. *Complexity, Expense, and Likely Duration of the Litigation*

The court need not speculate on the potential complexity, expense, and duration of litigation here because this matter was previously litigated and went to trial in DAI. Although the predecessor case was not a class action, it still involved intricate factual and legal issues, required substantial time and expense by the parties, and consumed significant judicial resources. The posture of the present cases—a class action and parallel government enforcement action— would only add another layer of complexity. See In re Austrian and German Bank Holocaust Litig., 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000) ("Most class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them."). Because litigation would impose significant expense on the parties and further delay relief to class members, the court finds this factor militates in favor of approving the Supplement.

### b. *Reaction of the Class to the Supplement*

"If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." Wal-Mart Stores, Inc., 396 F.3d at 118 (citations omitted). Here, the reaction of the class to the Supplement has been overwhelmingly positive. In the statements and submissions submitted to the court, only a few class members objected to the Supplement. Furthermore, although the court has taken steps to protect the identities of class members who expressed their views about the Supplement, other class members may have declined to speak at the fairness hearing or submit a letter out of fear of retaliation by adult home operators. (See Revised Order Approving Class Notice; see also Pls. Mem. at 14.) Therefore it is possible that support for the Supplement is even greater than the number of oral or written submissions to the court suggests. Due to the small number of objectors among class members, the court concludes that this factor weighs in favor of the Supplement. D'Amato, 236 F.3d at 86-87.

### c. *Stage of Proceedings and Amount of Discovery Completed*

This factor concerns whether there is "some evidentiary foundation in support of the proposed settlement." Plummer v. Chem. Bank, 668 F.2d 654, 659 (2d Cir. 1982) (citation and quotation marks omitted). "If all discovery has been completed and the case is ready to go to trial, the court obviously has sufficient evidence to determine the adequacy of settlement." Wal-Mart Stores, Inc., 396 F.3d at 118. However, "the absence of formal discovery has not always prevented consideration of the settlement." Chatelain v. Prudential-Bache Sec., Inc., 805 F. Supp. 209, 213 (S.D.N.Y. 1992) (alteration adopted) (citation omitted).

As discussed above, the parties participated in extensive discovery and trial during the predecessor litigation, with which the court is intimately familiar. DAI, 653 F. Supp. 2d at 189

("Twenty-nine witnesses testified, more than three hundred exhibits were admitted into evidence, and excerpts from the deposition transcripts of twenty-three additional witnesses were entered into the record, along with the 3,500 page trial transcript."). After trial, Class Counsel also followed up with visits to all impacted adult homes, and Elizabeth Jones, an expert who testified in DAI, conducted follow-up interviews of residents in some of the homes. (Pls. Mem. at 15; Chepiga Decl., Ex. 6.) Based on this record, the court finds that "counsel had sufficient information to act intelligently on behalf of the class." Chatelain, 805 F. Supp. at 213.

### d. *Risks of Continuing Litigation*

The court considers together the fourth, fifth, and sixth factors—risks of establishing liability, risks of establishing damages, and risks of maintaining the class action through trial—as they all relate to the risks of continuing litigation. See Wal-Mart Stores, Inc., 396 F.3d at 118-20 (considering these factors collectively); Padro v. Astrue, No. 11-CV-1788 (CBA), 2013 WL 5719076, at *6 (E.D.N.Y. Oct. 18, 2013) (same). On these issues, a court should "assess the risks of litigation against the certainty of recovery under the proposed settlement." In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 459 (S.D.N.Y. 2004).

Although in DAI, the court found that plaintiff Disability Advocates, Inc., had established liability, there is no guarantee that the outcome of a retrial would be the same, and Plaintiffs would likely again have to defend any favorable judgment on appeal. Even if Plaintiffs ultimately prevailed, the remedy would likely resemble the original remedial order in DAI. With the Original Settlement—and with the Supplement—Plaintiffs can secure substantially similar relief while avoiding the uncertainty and delay of continuing litigation. Proceeding with litigation presents no risk related to establishing damages, which Plaintiffs do not seek in this case, and only a "limited risk" of decertification. (Pls. Mem. at 17.) However, Class Counsel

avers that "Plaintiffs have negotiated a settlement that gives Class Members the relief they seek—and sooner rather than later. Plaintiffs thus have little additional to gain from proceeding to trial." (Id. at 16.) The court agrees and finds that although the risks of continuing litigation may be low, they are outweighed by the "certainty of recovery" and immediacy presented by the Supplement. In re Global Crossing, 225 F.R.D. at 459.

### e. *Range of Reasonableness of the Supplement in Light of the Best Possible Recovery and Attendant Risks of Litigation*

The seventh factor, the ability of Defendants to withstand a greater judgment, does not apply here because Plaintiffs seek only declaratory and injunctive relief. Although there is no "settlement fund" in this case, the court considers the eighth and ninth factors together as a determination of the reasonableness of the Supplement in light of the best possible recovery and risks of litigation. In this inquiry a court may compare the proposed settlement to the relief sought by the plaintiffs. See Padro, No. 11-CV-1788 (CBA), 2013 WL 5719076, at *7.

The Supplement offers class members robust relief and reforms that have been sought by Plaintiffs and disability rights organizations throughout the present cases, DAI, and decades of prior advocacy: the opportunity to transition into the most integrated setting suitable to their needs. The State will provide enough supported housing units to meet demand, and Class members may undergo assessment to determine their eligibility to move into supported housing, and will be offered services to aid in their decision to move, transition, and daily life while in supported housing. When, as here, "[t]he settlement offers the class members the most important, most tangible form of relief sought by plaintiffs," these factors weigh in favor of approval of the settlement. Id.

### C. Attorney's Fees

16

Under the ADA and the Rehabilitation Act, a court may award "the prevailing party, other than the United States, a reasonable attorney's fee." 42 U.S.C. § 12205; 29 U.S.C. § 794a. "Ideally . . . litigants will settle the amount of a fee." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). A court assesses the reasonableness of a fee in light of the time and effort expended, the complexity of the cases, the high quality of representation, and public policy considerations. See Wal-Mart Stores, Inc., 396 F.3d at 121.

In approving the Original Settlement, the court determined the terms pertaining to attorney's fees to be reasonable. The court finds the terms pertaining to attorney's fees in the Supplement (see Proposed Supplement at 17-18) to be reasonable as well.

### D.  Class Members' Objections

The court received a few objections from class members. At the Fairness Hearing, Speaker Number Three stated: "There should be a guarantee that any adult home resident after [September 30, 2018,] also have the same opportunities as those who have gone before. Without this housing guarantee, you have residents with severe mental illnesses facing a dead end in the adult home." (See Fairness Hr'g Tr. at 42.) Another class member, in a written submission, stated: "I disagree with the housing program. I was attacked and assaulted by my roommate [and] almost killed and Transitional Services did nothing." (Pls. July 26, 2018, Letter Ex 1. at 56.) Another class member, in a written submission, stated: "Some of [the mentally ill] don't want to move or [are not] capable [of] tak[ing] care of an apartment." (Id. at 64.) A few other class members also articulated this same concern.

After considering these objections, the court finds that they do not present grounds that preclude approval of the Supplement. For one, the Supplement requires that class members be given *the choice* to move into supported housing if they are found eligible. It does not force

17

anyone to move or even to undergo an assessment to determine eligibility. The court believes this flexibility will allow the Supplement to respect the choices of all class members. As for Speaker Number Three's concern, the court appreciates this concern but views the September 30, 2018, deadline for opting into the class as a reasonable one. As for the concern of the class member who stated that he or she was attacked, situations of this sort militate in favor of approving the Supplement.

Thus, although class members did raise objections, the court finds that they do not present grounds that preclude approval of the Supplement.

\* \* \* \*

In sum, the Supplement need not be perfect in order to be fair, reasonable, and adequate, and in the court's view, the Supplement goes beyond these legal requirements.

### III.   CONCLUSION

For the foregoing reasons, the court finds the Supplement to be fair, reasonable, and adequate. The parties' joint motion for final approval of the Supplement in case No. 13-CV-4166 is GRANTED. For purposes of the associated case No. 13-CV-4165, the Supplement serves as a Consent Judgment and is also APPROVED.

SO ORDERED.

s/Nicholas G. Garaufis<br>
NICHOLAS G. GARAUFIS<br>
United States District Judge

Dated: Brooklyn, New York<br>
      September 5, 2018